POLY–FLEX, INC. and Tensar Corporation, Plaintiffs,

v.

CAPE MAY COUNTY MUNICIPAL UTILITIES AUTHORITY, D. Kemenash and Associates, Inc., J.H. Water Systems Inc., Earthwork Associates, Custom Structures Corp., Daley's Pit, Comstock Corporation, and First Indemnity of America Insurance Company, Defendants.

Civ. A. No. 91–3199 (SSB).

United States District Court, D. New Jersey.

Sept. 20, 1993.

John J. Petriello, Levy, Ehrlich & Kronenberg, Newark, NJ, Hal A. Emalfarb, Emalfarb, Swan & Bain, Highland Park, IL, for plaintiff.

James D. Ferrucci, Wolff & Samson, P.A., Roseland, NJ, for defendants.

## OPINION

BROTMAN, Senior District Judge:

Presently before this court in this diversity action are plaintiff's motion for summary judgment and defendants' cross-motion for summary judgment. Underlying these motions is a question of first impression relating to the requirements that need be met in order for a supplier in a public works construction project to collect funds from a surety on a statutory bond under the New Jersey Bond Act, *N.J.S.A.* 2A:44–143 *et seq.* For the reasons addressed below, the motions of both plaintiff and defendants are denied.

### I.  Factual Background

#### A.  Landfill Project History

Defendant, Cape May County Municipal Utilities Authority ("MUA"), is a municipal corporation of the state of New Jersey, organized pursuant to *N.J.S.A.* 40:14B–1, *et seq.* After public advertisement for bids, the MUA contracted on June 6, 1990 with D. Kemenash & Associates, Inc. ("Kemenash"),

for the construction of a project known as Contract SLF–28–89, Cell 1C, Secure Sanitary Landfill (hereinafter the "Project"). Kemenash supplied a Performance and Payment Bond dated May 4, 1990, issued by the defendant, First Indemnity of America Insurance Company ("FIA"), to the MUA covering the project, up to the contract price.

Kemenash entered into a subcontract with J.H. Water Systems, Inc. ("J.H. Water") in which J.H. Water agreed to provide all labor and materials necessary to install the liner systems required by Kemenash's contract with the MUA for the construction of the landfill project. J.H. Water subsequently entered into a subcontract with plaintiff Poly–Flex, Inc. (then known as Poly–America, Inc.) (hereinafter "Poly–Flex") in which Poly–Flex agreed to furnish and J.H. Water agreed to purchase certain materials known as Poly–Flex High Density Polyethylene 60 mil. liner material (hereinafter "HDP liner").

## B. Disputed Amount of Liner Material

Under the terms of the J.H. Water/Poly–Flex contract, the parties agreed to a sales price of $0.24 per square foot. Poly–Flex claims to have shipped to J.H. Water 1,586,-117 square feet of HDP liner for a value of $380,668.08. As verification of this amount, Poly–Flex offers the affidavit of its president, William Neill, various invoices, and bills of lading.

Defendants, on the other hand, claim receipt of only 1,527,422 square feet of HDP liner, constituting a value of only $366,581.28 under the contract. As verification for this amount, defendants contend that (1) "as built" liner placement panel drawings prepared by the MUA's construction manager show that the total amount of all liner material installed at the Project was 1,834,122 square feet, (2) the Liner Company, hired to complete installation of all liner material after the MUA declared Kemenash in default, exhausted all HDP liner and was subsequently forced to purchase an additional 306,700 square feet of liner material from a third party in order to complete installation, and (3) subtracting the amount of liner material purchased by Liner Company from the total amount utilized (as revealed by the as-built drawings) indicates that defendants possessed only 1,527,422 square feet of HDP liner.

## 3. Conclusion of Project and Aftermath

By February, 1991, Poly–Flex had received no payments for the materials it provided to J.H. Water. On February 8, 1991, Poly–Flex filed with the MUA a Municipal Mechanic's Lien Claim Notice pursuant to N.J.S.A. 2A:44–125, wherein Poly–Flex asserted a lien in the amount of $390,245.04. Poly–Flex subsequently reduced the amount of its lien to $384,981.60.

Subsequent to the filing of Poly–Flex's lien claim notices, Kemenash ceased all work on the Project. MUA demanded that Kemenash reman the job, and notified Kemenash of its intention to declare a default. Kemenash did not reman the job, the MUA declared Kemenash in default, and further demanded that the FIA, as surety, complete the contract pursuant to the obligations of the Performance and Payment Bond. The FIA agreed to discharge its obligations to the MUA under its performance bond to complete the Project. A "Takeover Agreement" between the MUA and FIA was executed on June 6, 1991. The FIA contracted with additional contractors, including the aforementioned Liner Company, to complete the Project. The FIA completed the Project and it was accepted by the MUA by resolution dated October 7, 1992.

Poly–Flex filed the instant action on July 29, 1991, jurisdiction vesting in this court pursuant to 28 U.S.C. § 1332. Subsequently, defendant FIA paid to Poly–Flex $376,-193.04. Of that amount, $366,581.28 represented payment in principal and $9,611.76 payment in interest. Poly–Flex has since readjusted the total amount it claims due under the contract with J.H. Water, arriving at $380,668.08. As such, the amount in principal currently in dispute is $14,086.80.

Disagreements over both law and fact arise in this controversy. First, the parties disagree over the factual showing that need be made under the New Jersey Bond Act, N.J.S.A. 2A:44–143 et seq., in order for Poly–Flex to collect funds on the statutory bond

held by FIA. Second, the parties disagree over whether Poly–Flex is able to make such a showing. Clearly the former issue requires resolution before the latter can be addressed. As such, these issues are respectively addressed below.

*II. Discussion*

A. Standards Governing Motions for Summary Judgment

It is initially necessary to lay out the standards governing motions for summary judgment. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

B. Disputed Issue of Law: Interpretation of *N.J.S.A.* 2A:44–143, 44–147

■ Prerequisite to addressing the factual dispute in this matter is the resolution of the parties competing interpretations of the New Jersey Bond Act, codified at *N.J.S.A.* 2A:44–143 *et seq.* (hereinafter the "Act"). Two sections of the Act underlie the instant dispute. Section 44–143, entitled "Additional bond for payment of claims for labor, materials and supplies; waiver," provides in relevant part:

> When public buildings or other public works or improvements are about to be constructed, erected, altered or repaired under contract, ... the State, county, municipality or school district shall require the usual bond, as provided for by law, with good and sufficient sureties, with an additional obligation for the payment by the contractor, and by all subcontractors, for all ... materials ... used or consumed in, upon, for or about the construction, erection, alteration or repair of such buildings, works or improvements.

Section 44–147, entitled "Form of and conditions in bond," provides a form for bond issuers to "substantially" adhere to, requiring payment for

> all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations for labor performed or materials, provisions, provender or other supplies ... furnished, used, or consumed in the carrying forward, performing or completing of said contract,....

Plaintiffs argue that these sections, read together, extend bond coverage to any subcontractor who supplies materials under a public contract, whether or not such materials are physically incorporated into the project. Defendants counter that the code sections extend coverage only to the extent that supplied materials are physically incorporat-

ed into the project. While this issue has been addressed by courts in other jurisdictions within the context of similar statutes, under the law of New Jersey it appears to be a question of first impression. Furthermore, given the dearth of case law, as well as the imprecise and somewhat contradictory statutory language, it is a very close question indeed.

■ When a federal court in a diversity action is required to construe a state statute, the court must first look to the statutory language in order to ascertain the plain meaning and intent. *New Jersey Dept' of Environmental Protection v. Gloucester Environmental Management Services, Inc.,* 800 F.Supp. 1210, 1214 (D.N.J.1992) (citing *Renz v. Penn Cent. Corp.,* 87 N.J. 437, 440, 435 A.2d 540 (1981)). When looking to the language, the court

> "should try to give effect to every word of the statute and should not assume that the Legislature used meaningless language." *Medical Soc'y v. Dep't of Law and Pub. Safety,* 120 N.J. 18, 26, 575 A.2d 1348 (1990) (citing *Gabin v. Skyline Cabana Club,* 54 N.J. 550, 555, 258 A.2d 6 (1969)). The court should not construe a statute so as to render any part of it inoperative or superfluous. *Paper Mill Playhouse v. Millburn Township,* 95 N.J. 503, 521, 472 A.2d 517 (1984); *Abbotts Dairies, Inc. v. Armstrong,* 14 N.J. 319, 328, 102 A.2d 372 (1954).

*Id.*

Taking the language of *N.J.S.A.* 2A:44–143 at face value, it seems evident to this court that materials must be "used or consumed," and not merely delivered, in order to warrant compensation. *N.J.S.A.* 2A:44–147, on the other hand, states that payment is required for materials "furnished, used, or consumed," clearly implying that materials need not be used or consumed as long as such materials are "furnished." The apparent contradiction within these respective statutes is problemat-

ic. One route for this court to take would be to accord more weight to § 44:143 than to § 44:147 since the former defines the scope of liability while the latter basically provides the form in which a bond should be drafted. This distinction, however, is a rather arbitrary one to make and is debateable to say the least.

Inasmuch as the plain language of the statute is not dispositive, the legislative history of the New Jersey Bond Act is helpful in interpreting the statute. This history reveals that, prior to a 1932 amendment, the statute provided coverage for "materials furnished in the construction" of a public project. The 1932 amendment replaced "furnished" with the "used or consumed" requirement. The Statement appended to the New Jersey Senate version of this amendment explains the legislature's intention to "broaden the scope of protection of bonds to those who supply labor, materials, provisions, provender or other supplies ... used or consumed in the furtherance or completion" of public construction projects. N.J. Session Law, May 2, 1932, Chapter 142, Senate Bill No. 65. Of course, this commentary begs the question of whether an incorporation requirement was read into the statute prior to the 1932 amendment. This court concludes that it was. Given that the legislature's intention was to broaden coverage—as the excerpt above indicates and as both parties in the instant case apparently concur—it is implicit that the use of "furnished" prior to 1932 connoted incorporation to the same extent that "used or consumed" did after 1932. Were a contrary conclusion to be reached, the 1932 amendment would not be a broadening but a narrowing.[1]

This conclusion is supported by case law interpreting the Act prior to the 1932 amendment. In *Hammill v. Commercial Casualty Ins.,* 5 N.J.Misc. 685, 687, 137 A. 884, 885 (N.J.Sup.Ct.1927), the court extended coverage to plaintiffs, truckers who transported

---

1. One might argue that the broadening aspect of the amendment was in its inclusion of "provisions, provender or other supplies, teams fuels, oils" and the like *in addition to* the former category of "materials." This point would be well taken. It seems unlikely, however, that the legislature intended to broaden the scope of included items while simultaneously narrow the manner in which such items must be used in order to qualify for bond coverage. If such was the intention of the legislature, it is nowhere indicated in the commentary and this court chooses not to read such a skewed meaning into the amendment.

materials to a construction site, on the basis that "[t]he labor was actually necessary in the prosecution of the work and went into the work to be performed under the contract...." The implication of this analysis is that, had the labor not been necessary to the "prosecution of the work" or did not go "into the work," bond coverage would not have been extended. Thus even when the sole requirement for bond coverage was that materials be "furnished," the court regarded incorporation as a required element. *See also Samuel Braen's Sons v. Fondo*, 52 N.J.Super. 188, 191, 145 A.2d 145, 146 (App. Div.1958) (coverage extended where materials "go into the performance").

Further support for this conclusion can be found in the case law of other jurisdictions in which courts, ruling on bond statutes similar to that of New Jersey, have enforced an incorporation requirement. *See Consolidated Elec. Distrib. v. Kirkham, Chaon & Kirkham*, 18 Cal.App.3d 54, 95 Cal.Rptr. 673 [verify] (1971) ("materials furnished" language interpreted to include incorporation requirement); *cf. Dukane Corp. v. Sides Constr. Co.*, 208 Neb. 227, 302 N.W.2d 721 [verify] (1981) ("actually used" language requiring incorporation).

In enforcing an incorporation requirement for statutory bond coverage, some states raise a rebuttable presumption of incorporation when the claimant has proven delivery of the materials to the site. *See Clutter Constr. Corp. v. State*, 139 So.2d 426, 428 (Fla.1962); *Cedar Vale Co-op Exch. v. Allen Utilities, Inc.*, 10 Kan.App.2d 129, 694 P.2d 903, 905 (1985); *Mid–Continent Cas. Co. v. P & H Supply, Inc.*, 490 P.2d 1358, 1362 (Okla. 1971). This distribution of the burden of proof relating to incorporation of materials is, in this court's view, a sound and balanced approach to interpreting the New Jersey Bond Act. As Poly–Flex observed in its moving papers, requiring a supplier to prove incorporation is especially burdensome since a supplier's role ends upon delivery and the delivered materials then remain in the sole control of the contractor. As such, this court chooses to adopt the rebuttable presumption approach in adjudicating the instant case.

Poly–Flex, in arguing against an incorporation requirement, makes two additional contentions that require discussion. First, Poly–Flex claims that the language of the actual bond issued by defendant FIA disproves an incorporation requirement. The relevant language states that payment will be made to "all persons ... furnishing materials ..., including all amounts due for materials ... consumed or used in connection with construction...." This language sheds no additional light on the issue of incorporation. The phrasing is ambiguous and the reference to "furnishing materials" begs the very question raised above: whether the term "furnishing" in and of itself implies incorporation. As concluded above, it does.

Second, Poly–Flex contends that the New Jersey Bond Act should be interpreted similarly to the Miller Act, 40 U.S.C. § 270a et seq., the statute governing payment bonds issued in conjunction with public works involving the federal government. That statute provides payment for "all persons supplying labor and material in the prosecution of the work" and has been interpreted such that proof of incorporation is not required. Reliance on this statute, however, is unwarranted. The statute does not include the "used or consumed" language of the New Jersey statute, making any analogy between the two for the purposes of the issue at hand tantamount to an apples to oranges comparison.

C. Application to Facts

▮ Having concluded that coverage under the New Jersey Bond Act extends only to materials incorporated into a project, the question becomes one of whether Poly–Flex can make such a showing. As discussed above, this court chooses to distribute the burden of proof as other jurisdictions with similar statutes have done. Thus, if at trial Poly–Flex is able to prove delivery of the additional $14,086.80 worth of HDP liner (58,695 square feet), incorporation of such materials will be presumed. The burden then will rest on FIA to rebut this presumption and prove that such materials were not incorporated into the landfill installation.

This court has carefully considered the evidence put forward by the respective par-

ties to the extent allowed under *Fed.R.Civ.P.* 56(c) and finds that neither plaintiff nor defendants are entitled to a grant of summary judgment. In regard to delivery of the materials in question, defendants accurately observe in their briefs that Poly–Flex offers rather weak evidence, largely in the form of bills of lading which are difficult to read and not all of which are signed by Kemenash employees. It cannot be said, however, that no genuine issue of fact exists as to whether or not delivery occurred. Poly–Flex is entitled to put their evidence before a jury on this question.

Of course, given the conclusion reached above regarding the proper reading of the New Jersey Bond Act, the delivery question would be of no legal significance if defendants had successfully shown that no genuine issue of fact exists on the incorporation question. Yet this court is reluctant to reach that conclusion. The evidence proffered by defendants on this issue, as described in Section I.B. above, is highly circumstantial and cannot be given conclusive weight at this stage of the proceedings. Giving Poly–Flex the benefit of the doubt (as is properly accorded the non-movant at the summary judgment level) and thus assuming that delivery did occur, the inability of either party to locate the materials in question puts into doubt defendants' indirect method of proving that the materials were not incorporated in the landfill installation. In other words, if the materials were delivered but not incorporated, where are they? The sufficiency of defendants' evidence on this issue, like Poly–Flex's evidence on the delivery issue, is properly left to the determination of a jury.

D. Conclusion

Having considered the legal arguments and factual showings of the respective parties, this court concludes that neither party has satisfied the standards governing summary judgment as stated in Section II.A. above. Accordingly, plaintiff's motion for summary judgment and defendants' cross-motion for summary judgment are denied. Assuming this case proceeds to trial, the above findings relating to coverage under the New Jersey Bond Act, *N.J.S.A.* 2A:44–143 *et seq.,* will inform the respective parties' evidentiary burdens at that proceeding.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

This matter having come before the court on the motion of plaintiff for summary judgment pursuant to *Fed.R.Civ.P.* 56(a) and the cross-motion of defendants for summary judgment pursuant to *Fed.R.Civ.P.* 56(b); and

The court having considered the moving papers and all opposition thereto; and

For the reasons stated in the court's opinion of this date;

**IT IS** on this 20th day of September, 1993, hereby

**ORDERED** that plaintiff's motion for summary judgment is **DENIED** and defendants' cross-motion for summary judgment is **DENIED.**

No costs.